Good morning, Your Honors. May it please the Court, my name is Dow Patton. I represent Carmen Cortes, who is also present in court today. This appeal presents the question of what is the requisite quantum of proof of circumstantial evidence only in a Title VII and FIHA race discrimination case based upon performance. And it's particular only to the question of pretext. It's not the question of the prima facie case was resolved by the district court below and is not at issue in this appeal. The real question for the Court here is what is that quantum of proof in the context of the public sector for-cause-only context, also in the context of a collective bargaining agreement. And what can — I thought you had a Title VII claim here. Yes, Your Honor. Why would we look at the standard of for-cause and whatnot? Well, Your Honor — You have a racial discrimination claim. Yes, Your Honor. And as I understood it, the district courts basically said, look, you gave us all this evidence about a comparator, a similar person, but it was just — you just dumped it on me. Yes, Your Honor. Right? And I — it's not my job to figure this out. Yes, Your Honor. That's what the district courts said. So isn't that what you did? No, Your Honor. It's not what we did. My declaration explained elements from that tabular data that was dumped on us by the county. Well, don't blame it on the county. You're a lawyer, right? Absolutely, Your Honor. I'm not blaming the county. Right. I went through in my declaration, and I added those up, and I presented that information in my declaration. And we also did that — I couldn't make any sense of those spreadsheets. I couldn't make any sense of the ethnic differences. There are plenty of Hispanic names. I thought that she was saying she was discriminated against because she was Hispanic. That's correct, Your Honor. She was the only Hispanic. The Hispanic names that may be Hispanic names appear as Hispanic names. There are other Hispanic names there, too. Well, no, Your Honor. Those are all Filipino names. She was the only Hispanic at the time. So the comparators, although they may have Hispanic names, are all Filipino. I thought of Tagalog was the aboriginal language that has become a Filipino lingua franca, that nevertheless, because Spain conquered the Philippines and ruled it for so long, that Filipinos were Hispanics. No, they're not Hispanics. They have Spanish-sounding names, but they don't speak Spanish. That's why they're not Hispanic. Your Honor, back to the question. Everyone speaks Tagalog? I'm sorry? Everyone speaks Tagalog? No. Actually, Tagalog is not the only language spoken in the Philippines, Your Honor. There's a number of different languages. However, I believe Tagalog is spoken in the Santa Clara County Auditor's Office. And this context is what matters, Your Honor. The context of being for cause, et cetera, is what you're saying is that Tagalog Filipino speakers discriminated against the Hispanic, and we're supposed to be able to see that from those spreadsheets. From the declarations that sum up the data, the quantifiable performance metrics that she's — which comprise the standard that she's held to. She's held to a quantifiable performance metric of audits completed. Now, there may be some detail in there of Class I, Class II, Class III. Set those aside for a moment. What we've done in the — in the — our briefing is to go through and show how that data presented to the trial — to the district court in the declarations and attached in the declarations is that those numbers represent failures, massive repeated failures by non-Hispanics to comply with deadlines set department-wide. Was there anyone else who was as unsuccessful in keeping up with the workload as Cortez? Absolutely, Your Honor. And we've identified those in our — in our opening brief. If we go through them one by one at each level of discipline. I'm looking for the proof, actually. Certainly. And this comes back to these spreadsheets that I couldn't make head or tail of. Certainly, Your Honor. The — at each level, what we've done is identified who was completing what amount of audits at that time, at the time that Ms. Cortez was disciplined. And the evidence is clear that in each instance, every time she was disciplined, there's some — there's at least one, and oftentimes more, auditor appraisers, not senior auditors — we've included senior auditors as well — but auditor appraisers who are held to a different standard. They are not disciplined. And, Your Honor, more back to the point of why for cause matters. But where does the — so I'm really confused about these documents, too. I couldn't figure them out either. But where in the record does it show exactly what you just said? Your Honor, the documents that are attached as Exhibit I to the Patent Declaration, which are starting in ER-226, along with the declaration, the last several pages of the declaration, I go through and they aggregate that data for the court. And we presented that to the court at summary judgment. The for cause matters, Your Honor, because that's what creates documentation. And in the — in an at-will scenario, you don't have to document when you want to terminate somebody or you don't have to have any document. Your claim here is not that they didn't have cause to terminate her under the county charter. Your claim here is that they engaged in racial discrimination. Absolutely, Your Honor. Right? That's it. Absolutely. And that's your claim. And your claim, what you have to do, what you had to do or convince the district court was that there was a genuine tribal issue of fact over pretext. Yes, Your Honor. That's all you had to do. Yes, Your Honor. And you tried to do that with this data. Now, the district court said if you just look at this data, you don't do it. But is that all the district court was required to look at? No, Your Honor. The court was required to look at the context. And I — the context of four clauses. What the court has to look at is specified in Rule 56. Yes, Your Honor. And it would be nice if you just gave us a page number in the excerpts or something that shows that there's evidence of racial discrimination. Yes, Your Honor. It's the — it's numbers. As I've already identified, the patent declaration at ER 27 through 30, and then the Exhibit I, which is commencing at ER 226, which is the underlying data. Yes, the underlying data. Your Honor, the absence of a record, it's the absence of a record. So in the four-cause world, when you fail performance, that results in a record. She also was disciplined but not fired for falling behind on her audits, as I recall. As I recall, she was disciplined multiple times. And then finally, when it didn't take, she was fired. That's correct. And, Your Honor, we have identified at each level of discipline comparators who did exactly the same or worse than plaintiff, than Ms. Cortez did. And they received no discipline. And there is no documentary record in the four-cause system that would identify performance as the issue. And if performance is not the issue, then it must be race. Because the rest of the context matters, Your Honor. The rest of the context matters. The only Hispanic, no one ever — So the only reasons anyone ever gets fired are bad performance or race? Not at all, Your Honor. But we have to look at the totality of the circumstances. A stark racial disparity where Filipinos comprise an order of magnitude more in the population of the auditor's office than they do in the county of Santa Clara census. We have never before has any auditor appraiser been subjected to a — the type of write-up, an unfavorable review. Never in the history of the Department. She's the absolute first. And why? Let's go back to her one-to-one comparator. The person hired at the same time as her, Joey Kimpo. The very beginning, Joey Kimpo didn't complete nine to eight to nine audits by December. Did he — was a document created? Did the four-cause system work? No. There was no document created. I understand now why my first reading of this patent declaration didn't make much of an impression. And that's because my review of it doesn't either. I don't understand what it's supposed to prove. Your Honor, at the end, the last eight paragraphs of the declaration go through and upon review of Exhibit I, I have made the following calculations. And I have identified those calculations, the individuals who performed and what their performance metrics were, what their numbers were. It is undisputed. It is undisputed by the county. Those numbers are undisputed by the county. They have no explanation for them. There is no explanation offered whatsoever why, when this list of eight people who don't complete their audits by May 30th, 2008, which is a department-wide standard, why that doesn't result in a single discipline. Indeed, there's no discipline ever until Ms. Cortez makes a complaint of race discrimination. Yes, Your Honor. So to sum up, I guess, as I understand your argument, is that this statistical data, or I don't want to say statistics, but this data that you presented about the makeup of the office, she's the only Hispanic predominant, 76 percent Asian or African-American. And the comparative evidence that you give was sufficient to raise a tribal issue of fact that the proffered reason, which was poor performance, was just pretext for the true reason, which was they wanted to get rid of her because she wasn't Filipino or Asian. That is correct, Your Honor. And more to the point, the substantial and specific evidence required that the circuit law is very clear, you can't rely just on your prima facie case, but at the same time, we're offering all of our evidence at the same time. I'm not parsing that. Right. Circuit law says you look at it all. You look at whatever you offered for prima facie and you add it all together and you look to see whether you've created or raised a genuine tribal issue of fact. And in particular, in the four-cause arena, and discrimination and discipline, it's necessary to marshal all that evidence at once and say whether it meets the prima facie case or it's casting doubt that performance is an issue. If performance was an issue, if completing the audits by May 30th was an issue, the four-cause system would have a record of that. Were there ever any — I don't recall any evidence of people making remarks anti-Puerto Rican remarks or that sort of thing. I just remember these numbers. That is correct, Your Honor. There is no direct evidence that we have and presented. This is a pure circumstantial evidence case, which is a very difficult case and it's ignored. Some of these numbers, she said she was responsible for 28 audits in 2005 and completed 27, but the county says that she was originally assigned 42 audits, and all those excess audits over the 28 that she said she was responsible for had to be reassigned to other people. And then in 2009-10, she says she was assigned five audits, but her boss testified that she was assigned 34 audits, and he had to reassign 30 because she didn't finish on time. And then the county says that the supervisors constantly had to correct her audits because — and return money to businesses that she'd audited incorrectly. So it sounds like they've got lots of uncontradicted performance data, and I didn't see where you showed that anyone else's performance was that bad and wasn't disciplined. Your Honor, it's in Exhibit I. It's in the Patent Declaration. It's in the last eight paragraphs of the Patent Declaration. And it's in those, and I couldn't make them out. I couldn't see how it was in them. Your Honor, it's been laid out a little more clearly in a tabular format in a reply brief, which shows the people, when they — when May 30th rolled around, there were many others. So what you want me to do is analyze this like this myself and figure out who's Puerto Rican and who's Hispanic and how many audits they got assigned. This just shows that audit by audit, you want me to do the math. No, Your Honor. And after guessing about their ethnicity. Absolutely not, Your Honor. The evidence is uncontradicted. She was the only Hispanic. So everybody by definition that's not named Cortez in there is a comparator outside of her protected class. So there's no guessing involved. The Patent Declaration went through and tallied various aspects of that. Those aspects have been tallied both in our opening brief as well, showing that at the time she was receiving the discipline, there were others that did exactly the same thing or worse and had no record of discipline whatsoever. And were the tallies the proof of that? They're in our opening brief and we've cited — we have cited to the underlying documents, Your Honor. Well, if you — your reply brief has these very clear tables, but I think you would have advanced your case in front of this district court judge if you would put those clear tables with the, you know, the document citation before the district court. Understood, Your Honor. I know that I'm about out of time, but we took tabular information and tried to make it into narrative information. And now I've taken narrative information and put it back in tabular form. But you're saying it's just the same information and the district court judge didn't — wasn't able to glean it from what you put before him the first time. Thank you, Your Honor. Okay. Thank you. Good morning, Your Honors. David Rolo, appearing for the County of Santa Clara. We're here today because plaintiffs in the underlying district court did not submit specific and substantial evidence to the district court. Well, he submitted circumstantial evidence, which is just as good. He submitted a lot of circumstantial evidence.  Why not? It's a tribal issue of fact. The appellant did not pinpoint the evidence as required by the code. Well, he certainly presented the data. It wasn't if like — it wasn't like he just said in opposition to summary judgment I rely on everything that's in the record. He brought the data to the district court. The rule requires a pinpoint citation to the evidence in the record. Well, that's for your — that's for stating your statement of undisputed facts. It's in reference to the opposition to the motion. This Court just a month ago in the Stanislaus Food Products case reaffirmed the fact that specific facts must be set forth in evidence in the record, no bulk references to a stack of documents. Well, he had the underlying data with a declaration. Now, admittedly, it was a little bit confusing, but the underlying data is there. You've supplied the underlying data, right? I can talk about how — No. Did you supply the underlying data or not? We did. You did. You took it from your own records, you stripped it of information, and you gave it to him. Correct? Correct. And he used it to the extent he could. To the extent that he used it, yes. The patent declaration that was referred to earlier specifically references non-similarly situated senior auditor appraisers. Half of the declaration refers to auditor appraisers that have a different job function than the plaintiff. That's an argument that you have, right, based on the facts? That's an argument you have? That is a fact from the declaration, yes, that the comparison that was attempted to be made was not to similarly situated auditor appraisers. Well, in this case, you could argue that no one was similarly situated because of the way Tarillo did these individualized work plans. So she put everybody at different standards and was kind of being a little arbitrary about who complied with these standards and who didn't comply, or you could call it racial discrimination. Well, every auditor appraiser in the division has a work plan, and Appellant's work plan was by agreement. It's not like Tarillo was imposing a work plan on her. The evidence is her work plans were agreed upon. I'm sorry. Go ahead. Well, I was going to say with respect to, in particular, the 2009-2010 fiscal year, the evidence is the Appellant chose not to abide by the work plan her supervisor suggested. She drew up her own work plan and even then was not able to complete a single audit by May of the fiscal year. As I understand the theory of her case, it's that, yeah, there were these work plans, but I got singled out for punishment because I was not Filipino or Asian. I was Hispanic. Or you could characterize it as she was set up to fail for that reason and then retaliated against when she complained. Well, I don't know how she would have been set up to fail when she was assigned a similar number of audits. Because she was brand new. How long was she employed there? She ended up being employed for five years. But the first couple of years, wasn't she getting called out by Tarillo when she wasn't yet fully trained in the job? The evidence in the case was the Appellant was a fully trained auditor appraiser with years of private sector experience. The suggestion in the Appellant's brief that she didn't get her board certification until after her first year of work is misleading. The complaint in the case references the fact that that's a perfunctory requirement by the state. Did she get a lot better after the first year of work in terms of completion? She got worse. By the time the last fiscal year was involved, leading up to the termination notice, she was assigned, and this was not referred to in the reply brief. The reply brief ignored this fact, as you pointed out. She was assigned 34 audits for the fiscal year 2009-2010. Pursuant to a work plan, she drew up. She did not complete a single audit. Thirty of those audits had to be reassigned to other auditors who had comparable levels of work to begin with. Her performance by the time of the last fiscal year, the year prior to her termination, had disintegrated to the point where she was literally doing no work. She got worse instead of better despite more experience? The evidence is she got far worse as opposed to improving, which of course was the incentive for the disciplines in the first place. Was there some kind of health problem that was documented in the record? I don't remember anything. She took leaves on various occasions. In the fiscal year of, I believe it was 2007-2008, her audits were reduced. She was only assigned 20 audits for that fiscal year compared to the office average of 36 or 37. And how many did she get done? She still had problems completing her audits in a timely fashion. The issue in this case was she did not submit her audits in a timely fashion throughout the fiscal year sufficient to allow. Could you take a look for me at this patent declaration? I have trouble making sense of it because it seems to depend a lot on knowing who everybody is, and I don't know who anybody is. And you said it doesn't count because some of these people are at a higher level where they get fewer but harder audits. I think that's what you meant. Sure. But I can't see that in the declaration, and I don't know what the declaration means. What does this mean? Well, I'm not sure what it means. It's not in the declaration that there are more senior people with fewer audits, is it? Yes, it is. Take a look at the excerpt of the record at page 29. Paragraph 13 makes a direct comparison between the appellant and five senior auditors at line 26. Do you see that? He says, however, 36 of the 40 auditors in the office completed their audits in the month of June 2006. In fact, five senior audits, auditors completed nearly half of the remaining audits in the month of June 2006, including and then names five people. I don't understand what the significance of that is. It's significant from my perspective because the appellant is attempting to ---- I don't mean significant in the sense of how would it help you or hurt you. I don't know what it means. Well, he's comparing the comparison here is to senior auditors. The evidence in the record is ---- Wait a second. Isn't that what that's talking about? Wasn't there an office deadline of May 1 for completing all the audits? And the point of that is that, okay, so maybe she didn't complete all her audits by May 1, but neither did these other eight people? The significance of it is if she's comparing herself to senior auditor appraisers, their caseload is different. Their audits are more complex.  I'm not disputing that they're similarly situated individuals. They are completely not. But there were others. There were others. There were others in a similar category. There were others. And there were others who were not meeting their expectations as well. I disagree. And there's evidence in the record to that effect. I disagree. I think the evidence is fair. Isn't there ---- But wait, tell me, am I missing this? I mean, I realize it's the umpteenth case on the middle of the week, but I clearly got from this, all of this, that there was in the office a deadline of May. So if you were completing your things in June, that was missing the deadline. And then if you weren't getting a verbal warning or something for missing the deadline, she was. And so she was being penalized for missing that deadline. And some of the other similarly situated people were not. Isn't that correct? Or is this a different case? No, I think that is a little bit off. What she was being disciplined for is a failure to keep up during the fiscal year. Right. But tell me about the May rule. Wasn't there a May rule? There was a May goal for the division. Finally, you're going to admit this. Okay. So is this paragraph saying, yeah, she's late? That's what this is about. So is this paragraph 13 saying, yeah, she was late, but everybody's late there? Well, that's what it's trying to say, but it does not cite any specific evidence of that. What it does do is cite to a comparator class that is dissimilar. Well, the evidence it cites is 36 of 40 auditors were also late. That's almost all the auditors, nine-tenths of the auditors. She is not disciplined. If you look at the dates of the discipline, the appellant is not disciplined for having audits remaining in June. She's disciplined for not keeping up during the fiscal year. Well, it's the same thing, right? No, no, no. You're talking about the flow basis now, right? Correct. Why don't you just use the language that's actually in the case so that you're clear and not, you know, you're sort of dancing around the language of what was going on in this case. So she was disciplined for not keeping up on a flow basis, and at one point she was having to do four and five audits a week in order to do that. Correct. Now, doesn't that seem like a bit much to put on one person? It's a bit much because she's not keeping up. So you give her more? And, I mean, it seems that's why, after I read this case, I thought, first of all, I think the district court did err because he didn't consider all the evidence at the pretext stage, and that's clearly against Ninth Circuit law. But secondly, it just seemed like she was, I mean, I used the word set up to fail, and I don't know what the reason was. And all these warnings and giving her more work when she's not being able to keep up doesn't seem to be able, isn't really going to help her, cure her problem. Well, the record in the case suggests she was given less work. She had audits reassigned. She had work taken away from her. As did other people, right? Pardon me? As did other people. No. There is no evidence of that in the record. I read that somewhere. She was the only auditor appraiser in the office that had audits removed during the course of a fiscal year so that the completion date could be reached. See, what bothers me about the district court judge's ruling is that I think he basically found facts, which you're not supposed to do on summary judgment. Well, I think the district court. So what he said, so for example, he goes, he zeroes in on the statistical evidence and he sets the standard for when you're trying to use statistics to establish your case, and he says it must, statistics must show a stark pattern of discrimination unexplainable on grounds other than race. They weren't really using it just for that here. But he says the statistical evidence presented here fails to meet that standard because the differences in workplace, in work patterns shown by statistics can be explained by the individualized nature of each auditor appraiser's work plan. He's just making factual, he's just dismissing them. No, I think what he's doing is he's following along the Schechner decision, which specified that statistics are okay to prove a prima facie case, provided there's a stark pattern of discrimination set forth in those statistics. But that's not what they were relying on here. That is, so as I said earlier, they're relying on the fact that others who did not keep up were not subject to the same kind of treatment and discipline. That's the problem. Well, but there was no evidence cited of others that did not keep up. Well, we're just going around and around now. Well, you know, the district court does find that Plaintiff has produced some evidence suggesting certain instances of disparate treatment. And he notes that she was the only auditor appraiser subjected to mid-probationary review. Do you dispute that, that she was the only auditor appraiser subjected to a mid-probationary review? No, that is not accurate. That's not accurate? Well, the district court found that. That's what he said. I understand that, but there is in the record evidence of another auditor appraiser subjected to a mid-performance evaluation. And was she the only auditor appraiser disciplined by Torrio in January through June 2006 for failing to complete audits on a flow basis? Yes. Okay, even though other auditor appraisers had a comparable amount of outstanding appraisals at that time? That is not correct. Other auditor appraisers were submitting their audits on a flow basis at the time of her discipline. So you're arguing that the district court got these facts wrong? What I'm saying is the record reflects the fact that she was the only auditor appraiser that did not submit her audits on a flow basis in a timely fashion. What does flow basis mean? On a monthly basis. If you have 36 audits assigned and you have a deadline of statutory deadline of June of the fiscal year, the idea in the office was to get most, if not all, of the audits completed by May so that there would not be a crunch of incomplete audits between May and June when the auditors had to submit by statute. The issue here is simple. Wait, wait. I'm asking you what flow means. Flow means on a steady basis, pursuant to the work plan. Is it like if something is assigned to you in April, you're expected to get it out by May, or if something is assigned to you in January, you're expected to get it out by March, or what? It would be like appeals in this court. If the clerks have 50 appeals to handle and write an opinion on by June, the division, the assessor's office expected that they would be seeing those opinions over time, not all at once at the end of the fiscal year. Some of us write our own opinions. Bad choice of words on opinion. Bad analogy. But what the flow basis means is rather than wait until the end of the fiscal year, the audits need to be submitted over time in a timely fashion. If you have 36 to 37 audits assigned to 30-plus auditor appraisers, and all of those auditor appraisers. But is there some standard for what flow means? Like 60 days? Well, I think that's set up in the work plans. In other words, three per month, four per month, five per month. That's what I'm asking. Is there some standard? I don't think there's an ironclad standard. Other than by the end of the fiscal year, or by the end of December, they wanted to see eight or nine audits complete out of the normally assigned 36 or 37, and that was part of the problem in this case. Appellant was the only auditor appraiser that was not completing audits by the end of December. And that problem carried over into the remainder of the fiscal year when, come May and June, there was a number of audits she had that was incomplete. If every auditor appraiser in the office submitted audits at the rate that the appellant did in this case, there would be a backlog come May or June. That was the problem. Did he answer? I don't have any more questions. All right. Cortez v. County of Santa Clara is submitted, and this session of the court is adjourned for today. Thank you, Your Honor.
judges: Kleinfeld, Wardlaw, Paez